In re OKLAHOMA P.A.C. FIRST LIMITED PARTNERSHIP, an Arizona limited partnership, Debtor.

The CANADIAN IMPERIAL BANK OF COMMERCE, Movant,

v.

OKLAHOMA P.A.C. FIRST LIMITED PARTNERSHIP, an Arizona limited partnership, Respondent.

Bankruptcy No. B–89–8110–PHX–SSC. Adv. No. "V".

United States Bankruptcy Court, D.Arizona.

Oct. 18, 1990.

John J. Hebert and Carolyn J. Johnsen, Phoenix, Ariz., for debtor.

Mary B. Fylstra, Gammage & Burnham, Phoenix, Ariz. and John D. Merrill, Thelen, Marrin, Johnson & Bridges, Los Angeles, Cal., for Canadian Imperial Bank of Commerce.

MEMORANDUM DECISION
AND ORDER

SARAH SHARER CURLEY, Bankruptcy Judge.

PRELIMINARY STATEMENT

This matter comes before the Court upon the Motion filed on December 19, 1989 by the Canadian Imperial Bank of Commerce ("Bank") that the automatic stay imposed pursuant to Section 362(a) of the Bankrupt-

cy Code be annulled.[1] The above-captioned Debtor, Oklahoma P.A.C. ("Debtor") filed its Objection to this Motion on January 17, 1990.[2] An Amended Motion also seeking vacatur of the stay was filed by the Bank on February 9, 1990; and an Objection to the Amended Motion was filed by the Debtor on February 26, 1990. All discovery was completed in this matter, a Joint Pretrial Order was filed by the parties and executed by this Court on August 13, 1990, and a Stipulation was entered into between the parties for purposes of this matter only and filed with the Court on August 13, 1990. The Bank filed a Memorandum of Law in support of its position on August 9, 1990. A Final Hearing, conducted as an evidentiary hearing, was held on August 13 and August 21, 1990. Post-trial Memoranda of Law were filed with this Court on September 4, 1990.

This Memorandum Decision and Order shall constitute this Court's Findings of Facts and Conclusions of Law pursuant to Bankruptcy Rule 7052. This Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334 and 157.

### FACTUAL STATEMENT

The Debtor was formed on August 31, 1989.

The Debtor's sole general partner is TBF Investments, Inc., an Arizona corporation (hereafter "TBF"). The officers and directors of TBF are as follows:

Wilford A. Cardon, President

Craig A. Cardon, Secretary

Elijah A. Cardon, Treasurer

Wilford A. Cardon, Craig A. Cardon, Directors.

TBF was incorporated on August 31, 1989. All of the stock of TBF is owned by Cardon Corporation, an Arizona corporation of which Wilford A. Cardon is president.

The limited partners of the debtor include: (i) Cardon, an Arizona general partnership, wherein Wilford A. Cardon, Elijah Cardon and Craig Cardon are general partners; (ii) Arrington–Cardon Investments, a partnership, located in Oklahoma City, Oklahoma, wherein Wilford A. Cardon is a general partner; and (iii) P.C. Investments, an Arizona general partnership, wherein Cardon Investments is a general partner. Cardon Investments is a general partnership consisting of Wilford, Elijah and Craig Cardon.[3]

On August 31, 1989, the Debtor filed a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code.

The Debtor has no employees, no priority wage claims, no unsecured claims, no trade creditors, and no personal property.[4] The Debtor does own certain parcels of real property. Except for two parcels of real property transferred to the Debtor *postpetition*, all of the real property was transferred to the Debtor on the eve of the filing of the bankruptcy petition. The Debtor obtained these parcels of real property in exchange for granting its limited partners certain limited partnership interests in the Debtor. The Debtor acquired all of the parcels of real property only subject to the various liens or encumbrances against the

---

1. 11 U.S.C. § 362 provides in part that:

 § 362. Automatic Stay.
 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—
  \* \* \* \* \* \*
  (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
  \* \* \* \* \* \*

2. General Order No. 47 of the Bankruptcy Court, District of Arizona, requires that parties opposing a Motion to Vacate the Automatic Stay file an objection.

3. See Paragraphs (A.) 5–9 of the Joint Pretrial Order.

4. Paragraph (A.)9 of the Joint Pretrial Order.

parcels.[5] Thus, other than arguably real property taxes, the Debtor assumed no liability of any creditor in any of its acquisitions of real property.

The Debtor owns approximately 189 homes that are being rented, and are located in various areas of metropolitan Phoenix. These houses generate income; however, the Debtor has acquired these homes subject to first and second liens and other encumbrances.

The Debtor also owns approximately 121 homes located in various parts of the metropolitan Phoenix area that are subject to contracts or agreements for sale, whereby third parties are paying the Debtor over time to acquire the residences. The Debtor retains title or ownership to the residences over the payment period. These homes, however, were also acquired by the Debtor subject to various encumbrances.[6]

The Debtor has income-producing property; that is, 70 construction loan houses subject to a general construction loan of a secured creditor. However, the Debtor apparently is not holding these funds.[7]

The other parcels of real property owned by the Debtor include a luxury house, an office building in Kansas City,[8] a shopping center in Lafayette, Colorado,[9] and four large tracts of undeveloped land.[10]

The subject of this adversary proceeding is a 1,053–acre parcel located at the intersection of Cotton Lane and Waddell in Surprise, Arizona ("the Surprise Property").[11] This is vacant land, located in Northwest Phoenix, that has been described as three separate parcels.

The Surprise Property is currently leased to Leyton Woolf, Jr., for the cultivation of citrus. After payment of water assessments and taxes, the Debtor receives net income from the Woolf lease in an amount that is less than $40,000 per year.[12]

The Bank entered into a loan transaction in 1985 with Cardon Oil, now known as Cardon, an Arizona general partnership, which is a limited partner of the Debtor ("Cardon"). Cardon executed on April 1, 1985 a promissory note in the original principal amount of $10,000,000.[13] The Note was secured by a Deed of Trust on the Surprise Property.[14] The Surprise Property was not the original collateral for the Note.[15]

The Bank is owed principal, interest at the contract and default rate as set forth in the Note, attorneys' fees, Trustee's Sale Guarantee fees, and other fees in the aggregate amount of $12,243,480.50. The Debtor stipulated to this figure for purposes of the Final Hearing only.[16]

Cardon subsequently defaulted on the Note, and a Trustee's Sale of the Surprise Property was scheduled for November 28, 1989 at 10:00 a.m.[17] *On November 27, 1989, after the Debtor had filed its Chapter 11 petition,* Cardon transferred the Surprise Property to the Debtor subject to the lien or encumbrance of the Bank.[18]

It is undisputed that the Debtor did not seek Court approval for the transfer of the Surprise Property.[19]

One other parcel of real property was also transferred to the Debtor postpeti-

---

5. Debtor's Exhibit FF, Pages 3–4.

6. Debtor's Exhibit FF, Page 3.

7. Debtor's Exhibit FF, Pages 3–4.

8. The automatic stay was vacated as to the Kansas City property.

9. The automatic stay was vacated in a Bench Ruling of this Court on September 5, 1990. The Court has subsequently executed an Order vacating the automatic stay.

10. Debtor's Exhibit FF, Pages 3–4.

11. Debtor's Exhibit FF, Page 4.

12. Paragraph (A.)1 of the Joint Pretrial Order.

13. Bank's Exhibit No. 1.

14. Bank's Exhibit No. 2.

15. Paragraph (A.)3 of the Joint Pretrial Order.

16. See Stipulation regarding Amounts Owed to Movant, filed August 13, 1990.

17. Paragraph (A.)4 of the Joint Pretrial Order.

18. Paragraphs (A.)11–12 of the Joint Pretrial Order.

19. Paragraph (A.)12 of the Joint Pretrial Order.

tion.[20]

As to the value of the Surprise Property, the Debtor presented the February 7, 1990 appraisal indicating a fair market value of $16,000,000.[21] However, the Surprise Property was purchased in 1986 by Cardon for $8,640,000.[22] The Debtor's Appraisal utilized The Fontaine Group Study in its analysis. From that Study, the Appraiser estimated that the Surprise Property would be sold for Low Density (i.e. Ranchettes, traditional homes, adult-oriented community), Medium Density (i.e. patio homes, luxury duplex), or High Density (i.e. townhouses, apartments) users. Initially 61 units would be absorbed in 1990, and this would increase to 245 units in 1995. The Appraiser believed, however, that no "single family attached product" should be introduced to the market until 1992 or 1993 to permit the units to be sold for higher prices.[23] The Fontaine Group Study is simply sandwiched into the Debtor's Appraisal, with no real follow-up or detail by the Appraiser as to the validity of the Study or how said Study had an impact on value. Based upon the testimony of the Debtor's Appraiser at the Final Hearing, this Study was utilized by the Appraiser for much more than informational purposes, yet the Appraiser had never heard of The Fontaine Group before and had not verified the accuracy of the data.

Many of the land sales utilized by the Debtor's Appraiser as comparables were from 1986 and 1987, and include much smaller parcels (300 acres), some of which were sold with carryback seller financing.[24]

The Court relied more heavily on Comparable Sales No. 10 and 11, which were sales of vacant land in 1989, one of which was zoned R–43 (as the Surprise Property). The Debtor's Appraiser estimated that

these sales might reflect a value for the Surprise Property between $15,625 to $15,809 per acre.[25] However, the Debtor's Appraiser also noted that since 1989, the market in the Phoenix area had been "flat;" that even at a value of $15,000 per acre or an aggregate value of $16,000,000 as estimated by him for the Surprise Property, there were few (if any) buyers; that at said value of $16,000,000, it would require the buyer to hold the property for five (5) years. Finally, the Appraiser noted that "it would be very difficult, probably impossible, to arrange financing on a property of this size (and value)."[26] The Debtor's Appraiser also assumed in concluding that the Property had a value of $16,000,000, that "reasonable seller-provided financing" would be given to the buyer.[27]

The Bank's Appraiser assumed that the property would be sold for "cash terms."[28] The Appraiser testified that providing seller or carryback financing might cause an upward adjustment to the value of the real property. The Bank's Appraiser also indicated that the highest and best use of the property was to hold for speculation, yet made no adjustments for value based upon that use.[29] The Appraiser used land sales from 1989–1990; however, one of the sales involved a sale of a distressed property.[30] The other comparables were only listings, and one of these listings was within the noise and crash hazard area of Luke Air Force Base, which is not where the Surprise Property is located.[31] The Bank's Appraiser noted that the current Phoenix market was in a state of "gridlock." Comparable No. 3 of 1,377 acres, which had been offered for sale for two (2) years, had only been absorbed at the rate of 40 acres

20. Paragraph (A.)13 of the Joint Pretrial Order.

21. Debtor's Exhibit A.

22. Debtor's Exhibit A, Page 15.

23. Debtor's Exhibit A, Pages 25–26.

24. Debtor's Exhibit A, Comparables No. 1–8.

25. Debtor's Exhibit A at Pages 38–39, 43.

26. Debtor's Exhibit A, Page 44.

27. Debtor's Exhibit A, Page 46.

28. Bank's Exhibit No. 3.

29. Bank's Exhibit No. 3, Page 27.

30. Bank's Exhibit No. 3, Pages 32–35; 39–40.

31. Bank's Exhibit No. 3, Pages 36–38; 41–42.

per year.[32] Therefore, the Bank's Appraiser determined that the size of the Surprise Property would warrant a downward adjustment from the $12,000/acre value on Comparable No. 3.

Analyzing both the Debtor's and Bank's appraisal, and the testimony of the Appraisers at the time of the Final Hearing, the Court believes the fair market value of the Surprise Property is $12,000,000, or approximately $12,000 per acre.[32a]

One of the Debtor's principals testified that it would be difficult, if not impossible, for the Debtor to reorganize without the Surprise Property.

The Debtor testified through its principals that it had $1,000,000 in cash currently. However, creditors with liens or encumbrances against the property which the Debtor owns have a claim to the cash as it is being generated. One of the Debtor's principals estimated that 60 percent of the cash being generated was subject to such claims. Although the Debtor estimated that a substantial portion of this fund (i.e. 40 percent) would not be subject to any such claims, this Court in its decision on the record as to the City of Lafayette's Motion to Vacate the Automatic Stay in early September, 1990, determined that the claims against just one parcel of the Debtor's real property, (the Shopping Center in Lafayette, Colorado) and administrative expense claims would effectively deplete, at the time of confirmation, the amount of $400,000 that the Debtor was currently holding and which was not subject to any claims of secured creditors.

Although one of the Debtor's principals testified at the Final Hearing that a settlement had been reached with the creditor that is owed approximately 50 percent of the indebtedness being asserted against the Debtor's properties, that settlement has been disavowed by the creditor.

The Debtor also introduced into evidence an appraisal of the Shopping Center in Lafayette, Colorado to reflect that the Debtor has parcels of real property with substantial equity.[33] However, this Court has concluded in its September 5, 1990 Bench Ruling that the Shopping Center in Lafayette, Colorado has a value of $1,800,000, not $2,950,000 as the Debtor has urged.

On the issue of good faith, the Debtor testified through its principal that Cardon and its related entities have been in business for 25 years. In late 1988 and early 1989, the discretionary income of Cardon and Cardon-related entities began "drying up." Cardon developed an out-of-court or workout plan to repay its creditors; the hallmark of the workout would be that no one creditor would gain an advantage. Cardon was able to pay off the sum of $100,000 of its indebtedness through this workout. Cardon, as previously indicated, owned the Surprise Property.

The Debtor was apparently created "for creditors taking unfair advantage" in the Cardon workout and "to protect the equity in the properties for unsecured creditors." Texaco, a party that had just completed its own Chapter 11 proceeding, was also interested in purchasing the convenience markets of Cardon, a portion of Cardon's property. The sale would not, and could not, be completed with Texaco if Cardon filed Chapter 11 proceedings. Therefore, the Debtor was created, and property was transferred into the Debtor, to accomplish the following:

1. Permit the Texaco sale to close, which would not occur if Cardon filed Chapter 11.

2. To set up procedures to prevent certain creditors from taking "unfair advantage." ·

3. To prevent the filing of bankruptcy petitions by other Cardon—related entities.

4. To develop a plan of reorganization to pay the creditors trying to take "unfair advantage" and other creditors 100 cents on the dollar over a period of time.

---

**32.** Bank's Exhibit No. 3, Page 42.

**32a.** With a value of $12,000,000, the 1,053–acre parcel actually has a value of $11,396 per acre.

**33.** Debtor's Exhibit C.

In November, 1989, the Surprise Property was transferred to the Debtor postpetition, without Court approval, because the Bank was about to foreclose on this Cardon property. The Debtor had a $21,000,000 appraisal from March 1, 1989,[34] and believed the Bank's debt to be only $10,000,000.

In 1989, Cardon apparently requested MAI appraisals on the properties that it owned. Thus, the Surprise Property and other properties were appraised at that time.

## LEGAL ISSUES

I. Whether the automatic stay should be vacated pursuant to Section 362(d)(2)[35] because *this particular parcel* of real property is not necessary for an effective reorganization.

II. Whether the automatic stay should be vacated pursuant to Section 362(d)(1)[36], inasmuch as

(a) the property was transferred to the Debtor postpetition without prior Court approval; and/or

(b) a review of the totality of the circumstances dictated that the property was transferred to the Debtor in bad faith.

The Bank has also raised the issue that based upon all of the facts presented to this Court, the Debtor has filed its Chapter 11 petition in bad faith and that the automatic stay should be vacated pursuant to Section 362(d)(1) on this ground alone. For the reasons set forth hereinafter, I need not reach this issue.

---

34. Bank's Exhibit No. 4.

35. 11 U.S.C. § 362(d)(2) provides that:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

(2) with respect to a stay of an act against property under subsection (a) of this section if—

(A) the debtor does not have an equity in such property; and

## DISCUSSION

### I.

This Court has determined that the value of the Surprise Property is $12,000,000. The Debtor and the Bank have stipulated that for purposes of this Hearing, the indebtedness secured by liens against said property is in the amount of $12,243,480.50. Therefore, the Bank has met its burden of proof under the Bankruptcy Code. 11 U.S.C. § 362(g); *Stewart v. Gurley*, 745 F.2d 1194, 1196 (9th Cir.1984). The remaining issue is whether "such property is necessary for an effect reorganization" under 11 U.S.C. § 362(d)(2), as to which the Debtor has the burden of proof. *In re Gauvin*, 24 B.R. 578 (Bankr. 9th Cir.1982).

The Debtor has stated that the Surprise Property is one of its "crown jewels." In essence, the Debtor cannot utilize the Surprise Property for its plan of reorganization unless this Court concludes that substantial equity exists therein. The Debtor's principals testified that it would be "difficult, if not impossible," to proceed with reorganization efforts without this Property. However, a review of the Debtor's Plan of Reorganization and Disclosure Statement and the testimony of Debtor's principals at the Hearing only create· this critical need for the Surprise Property if this Property has a value of no less than $16,000,000. The Debtor proposes to transfer 75 percent of the Surprise Property to the Bank in full satisfaction of a $12,243,480.50 indebtedness. The Debtor intends to place the remaining 25 percent of the Surprise Property in an Asset Pool to be sold over a maximum period of five (5)

---

(B) such property is not necessary to an effective reorganization.

36. 11 U.S.C. § 362(d)(1) provides that:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; ...

years to pay secured creditors with deficiency claims.[37]

The reality is that there is no equity in the Surprise Property to pursue such a Plan. The Debtor has classified this Property as its "crown jewel." Unfortunately, it is a faux jewel. Using a *Wuthering Heights* analogy, the Debtor has tin "polished to ape a service of silver."[38] The Property still ultimately has some value; but not the great value promoted by the Debtor.

The United States Supreme Court decision of *Timbers of Inwood Forest*[39] requires this Court to conclude, as to a debtor attempting to impose the automatic stay as to an undersecured creditor, that a plan of reorganization is "in prospect," and that the debtor has " 'a reasonable probability of a successful reorganization within a reasonable time.' "[40] This Court must review this Debtor's Plan of Reorganization, determine how the Debtor intends to treat this particular parcel of real property—the Surprise Property—in its Plan, and going one step further, determine that *this* Property is essential for an effective reorganization of the Debtor that is in prospect. *Id. In essence, a mini-feasibility analysis of the Debtor's Plan is required. Because the Debtor has emphasized only one use for the Surprise Property, and said use is unrealistic or improbable, the Debtor has failed to meet its burden of proof under Section 362(d)(2).* The automatic stay must be vacated.

## II.

The other matters for determination by this Court pursuant to Section 362(d)(1) focus on several issues of major importance.

The Debtor was created on the eve of its filing a Chapter 11 petition. It is a "new debtor" whose sole business is to hold numerous parcels of real property. It was created to take care of recalcitrant creditors of a *nondebtor entity.* To prevent the nondebtor entity, or related entities, from filing their own Chapter 11 proceedings, to allow the nondebtor entity to proceed with its own out-of-court plan or workout, to handle those creditors who appeared to be taking "unfair advantage," the Debtor was born. However, this Debtor has

- no employees;
- no priority wage claims;
- no unsecured claims;
- no trade claims;
- no personal property; and
- no liabilities, except

    for a minimal amount of real property taxes, for which the Debtor may be liable, and administrative expense claims created because this Chapter 11 was filed.

Where is the Debtor that desires and deserves a "fresh start"? This Debtor is simply not at risk. However, the nondebtor entities would at least have indebtedness for which they were responsible that could be restructured. This Debtor and the nondebtor entities have nothing to lose with this current Chapter 11 proceeding: the nondebtor entities gain critical time to complete their out-of-court plan or workout without the interference of their recalcitrant creditors; this Debtor has assumed none of the liabilities of the nondebtor entities, so if the automatic stay is vacated as to a parcel of real property here or there, it is of no moment; and if this Court were to dismiss this Chapter 11 proceeding, then the nondebtor entities are simply back to determining whether they should file their own Chapter 11 petitions. The final touch to this "nothing to lose" approach is for the nondebtor entities to transfer encumbered property to the Debtor postpetition, for little or no consideration, moments before the

---

**37.** Although the Debtor has a class of unsecured creditors and a class of secured creditors with deficiency claims in its Plan of Reorganization, the Debtor has stipulated for purposes of this Hearing that it has no unsecured creditors.

**38.** Emily Bronte, *Wuthering Heights* at 211 (1964).

**39.** *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740, 17 CBC2d 1368, 16 BCD 1369 (1988).

**40.** *Timbers,* 484 U.S. at 376, 108 S.Ct. at 632 (citation omitted).

property is to be sold at a trustee's sale, claim it as property of the bankruptcy estate, and assert that the automatic stay prohibits any further action concerning the property. The Debtor does not seek Court approval for such a postpetition transaction. With such a scenario, no out-of-court plan or workout will ever fail.

The Debtor believes that transferring property to a new entity prepetition *or postpetition* to avoid the collapse of an out-of-Court workout of a *nondebtor* entity has a valid business purpose and hence evidences good faith on the part of the Debtor and the nondebtor entity. The Debtor's reliance on *In re Beach Club*, 22 B.R. 597 (Bankr.N.D.Cal.1982) is misplaced. In *Beach Club*, the Court determined that a nondebtor entity was involved in other limited partnerships and that the filing of a Chapter 11 petition by the nondebtor entity would jeopardize the development plans of these limited partnerships. The nondebtor entity transferred certain property prepetition to a new entity, and then had the entity file a Chapter 11 petition. The property was transferred to the new debtor entity on the eve of a nonjudicial foreclosure sale.

Although the Court's reasoning in *Beach Club* may be questioned, that Court determined at the Final Hearing on the Motion to Vacate the Stay that the real property had a value of $1,600,000, that the indebtedness constituted only 50 percent of said value, and that the liability of the nondebtor entity was unaffected by said transfer. None of these factors are present in the case before this Court. In this matter, the Debtor has no equity in the Surprise Property. Moreover, by the Debtor's transferring the Property in its Plan of Reorganization to the Bank in full satisfaction of the Bank's indebtedness, the *nondebtor* entities are also released from any liability due and owing to the Bank. Finally, the Debtor's Plan of Reorganization further enjoins lenders with liens on the Debtor's properties from pursuing *nondebtor entities* on any deficiency claims while the Debtor's Plan is in effect. These provisions of the Debtor's Plan clearly support this Court's finding that the Debtor and the nondebtor

entities have engaged in a "nothing to lose" approach by proceeding with this Chapter 11 case.

■ Should such a "nothing to lose" approach be sanctioned by a Bankruptcy Court? Surely given the facts in this matter sufficient "cause" has been shown under Section 362(d)(1) to vacate the automatic stay as to the Surprise Property. This particular parcel of real property was transferred to the Debtor in bad faith. *This Court concludes that any property transferred to a debtor postpetition, outside the ordinary course of business of the Debtor and without prior Court approval*, is presumptively done in bad faith. The debtor may rebut this presumption, but it is a heavy burden.

The Debtor has relied on Section 541(a)(7) of the Bankruptcy Code to justify such postpetition transactions. First, it should be noted that the transfer of the Surprise Property was outside the ordinary course of the Debtor's operations. Since the Debtor is a "a new debtor", created on the eve of the bankruptcy filing, anything other than collecting rent proceeds from the houses that the Debtor is leasing or payments on the agreement-for-sale houses is outside the ordinary course of this Debtor's operations. Second, the nondebtor entity had defaulted on the indebtedness concerning the Surprise Property, the Bank had accelerated the indebtedness, the Bank had followed the appropriate nonjudicial foreclosure procedures under Arizona law, and the Surprise Property was about to be sold at a duly noticed, regularly conducted trustee's sale at the time it was transferred postpetition to the Debtor.

Certainly Section 541(a)(7) does not create a safe harbor for such transfers. This provision of the Bankruptcy Code reads as follows:

(a) The commencement of a case section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

\*　\*　\*　\*　\*　\*

(7) Any interest in property that the estate acquires after the commencement of the case.

This provision is simply consistent with the broad definition of property of the bankruptcy estate. It ensures that as the debtor receives property postpetition, it is not dissipated by the debtor. Consistent with one of the fundamental purposes of the Bankruptcy Code of ratable distribution to all creditors, the debtor is required to consider all of its nonexempt property received prepetition as well as that received postpetition—in the liquidation of its assets or in a plan of reorganization that contemplates payment of its creditors over a period of time. *Cf. In re Shepherd Oil*, 118 B.R. 741 (Bankr.D.Ariz.1990).

However, Section 541(a)(7) of the Code may not be read in a vacuum. To the extent that property is transferred postpetition to a debtor, without Court approval and out of the ordinary course of the Debtor's business, the debtor has presumptively engaged in a bad faith transaction constituting sufficient cause to vacate the automatic stay under Section 362(d)(1). Moreover, this Debtor received the Surprise Property just prior to the Bank's conducting a trustee's sale on the Property. This Debtor engaged in a bad faith transaction as to the Surprise Property. The presumption of bad faith has not been rebutted by the Debtor. The automatic stay must be vacated pursuant to Section 362(d)(1) of the Bankruptcy Code.

The parties have requested that this Court also determine whether the Debtor has filed its Chapter 11 petition in bad faith. If this Court concluded that the petition was filed in bad faith, such a conclusion would serve as an independent basis to vacate the automatic stay under Section 362(d)(1). *In re Yukon Enterprises, Inc.*, 39 B.R. 919 (Bankr.C.D.Cal.1984). A debtor's filing of a Chapter 11 petition in bad faith may serve not only as a basis to vacate the automatic stay, but also to dismiss the Chapter 11 proceedings under 11 U.S.C. § 1112(b).[41] *Matter of Little Creek Development Co.*, 779 F.2d 1068 (5th Cir. 1986).

Certainly in this case, the Debtor has exhibited each and every badge of bad faith as described by the Court in *Yukon Enterprises, supra.*

This Court has already determined as a result of Hearings on a creditor's Motion to Dismiss for "cause" under 11 U.S.C. § 1112(b) that this Debtor's Chapter 11 petition shall be dismissed if the following test is met:

1. Distressed properties were transferred prepetition or postpetition to the Debtor;

2. The Debtor has little or no unsecured indebtedness;

3. The Debtor has few, if any, employees;

4. The majority of the property owned by the Debtor

---

**41.** 11 U.S.C. § 1112(b) provides that:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan;

(9) termination of a plan by reason of the occurrence of a condition specified in the plan; or

(10) nonpayment of any fees or charges required under chapter 123 of title 28.

(a) as to vacant land, has less than a 20 percent equity cushion;

(b) as to income-producing, improved property, has a 20 percent or less equity cushion, and the nature of the property is such that it is continuing to decline in value, and the Debtor has insufficient funds or cash flow to provide adequate protection payments; and

5. The Debtor does not have

(a) a realistic source for an infusion of capital; or

(b) sufficient cash flow to maintain its properties or to pay the indebtedness encumbering said properties, or

(c) the ability to sell its properties in excess of the indebtedness encumbering said properties

to propose a confirmable plan of reorganization.

Although not as important in the Court's determination, additional factors that may be considered by the Court are:

6. The Debtor has no plan of reorganization or disclosure statement on file with the Court;

7. The Debtor was created on the eve of the filing of the bankruptcy petition; and

8. The properties transferred to the Debtor were subject to immediate judicial or nonjudicial foreclosure under State law.

This test was developed by this Court based upon numerous decisions in the Ninth Circuit and other Circuits to determine what factors established that a debtor had filed a bankruptcy petition in bad faith, and thus "cause" existed under Section 362(d)(1) to vacate the automatic stay or under Section 1112(b) to dismiss the Chapter 11 petition. *Little Creek Development Company, supra; In re Arnold*, 806 F.2d 937 (9th Cir.1986); *In re Mellor*, 734 F.2d 1396 (9th Cir.1984); *In re Thirtieth Place*, 30 B.R. 503, 505 (Bankr. 9th Cir.1983); *In re Stolrow's Inc.*, 84 B.R. 167 (Bankr. 9th Cir.1988); and *In re Can–Alta Properties Ltd.*, 87 B.R. 89 (Bankr. 9th Cir.1988).

Although the Bank and the Debtor presented evidence on whether the Debtor had filed its Chapter 11 petition in bad faith, and argued whether this Court's test on the issue (now law of the case) had been met, there was already persuasive evidence before this Court that the automatic stay should be vacated under Section 362(d)(1) or 362(d)(2) for the reasons stated in this Decision. Whether the Debtor has filed its Chapter 11 petition in bad faith shall be heard subsequently by this Court.

The Bank also focused on whether the Debtor could confirm a plan of reorganization over the objection of the Bank (i.e. whether the Debtor could effectuate a "cram down" of its plan under Section 1129(b)). Whether the Debtor shall be able to confirm a plan of reorganization over the objections of one or more of the creditors secured by a lien or liens on the property now owned by the Debtor shall also await another day.

Based upon the foregoing,

IT IS ORDERED that the automatic stay pursuant to Section 362(a) of the Bankruptcy Code is vacated.