**In re Mary Anne ELIA, Debtor.**

**Bankruptcy No. 92–03193–PHX–SSC.**

United States Bankruptcy Court,
D. Arizona.

July 12, 1996.

Bradley Stevens, Robbins & Green, Phoenix, Arizona, for Debtor.

Jeffrey Greenberg, Tucson, Arizona, for Western Farm.

David A. Damore, Vogel & Damore, Scottsdale, Arizona, for Trustee.

Walter Thompson, Chapter 7 Trustee, Scottsdale, Arizona.

## AMENDED MEMORANDUM DECISION [1]

SARAH SHARER CURLEY, Bankruptcy Judge.

On June 8, 1992, Walter Thompson, the Trustee, filed an objection to the claim of exemption by MARY ANNE ELIA, the Debtor, in certain real property in which the Debtor acquired an interest postpetition. On June 12, 1992, WESTERN FARM BUREAU LIFE INSURANCE CO. ("Western Farm") filed an objection to the same claim of ex-

emption. The Debtor filed her response opposing the relief requested.

The parties have fully briefed their respective positions in this matter. The Court has also conducted evidentiary hearings on April 8, 1993; April 22, 1993; August 13, 1993; October 19, 1993; and November 29, 1993.

The Trustee and Western Farm had objected to the Debtor's claim of exemption on certain jewelry. At the conclusion of the evidence presented in this matter, however, the Trustee and Western Farm withdrew their objection as to this property.

After closing arguments were presented to this Court, the matter was taken under advisement.

This Memorandum Decision constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* (hereinafter "RBP"). This is a core proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### Factual Discussion

Pursuant to a Dissolution Decree, on September 5, 1990, the Debtor was awarded a residence located at 9723 East Cochise Drive, Scottsdale, Arizona (the "Cochise Drive Property") and a cabin in Pinewood, Arizona (the "Cabin") as her sole and separate property.[2] Certain evidence was presented at the hearing that the Debtor had been attempting to sell the Cochise Drive Property over a prolonged period of time.[3] The Debtor subsequently entered into a contract to sell the Cochise Drive Property to a third party.[4]

At a trial before this Court, the Debtor testified that she had been attempting to sell

---

1. Because certain individuals requested that this Memorandum Decision be published, the Court has reviewed and made minor changes to the Memorandum Decision originally executed on October 7, 1994 and entered by this Court on October 18, 1994. For instance, in the original Memorandum Decision, this Court cited to the Bankruptcy Appellate Panel decision of *In re Alsberg*. The Court has now inserted the Ninth Circuit cite.

2. The Debtor's husband was Dr. James Elia. Dr. Elia filed a Chapter 11 petition on September 6,

1990, which was assigned Case No. 90–09433–PHX–GBN.

3. On April 22, 1993, the Debtor's fiancé testified that the Property had been for sale since the occasion when he first met the Debtor. The Debtor testified that she met her fiancé in 1989.

4. The objecting parties did not present any evidence that the sale of the Cochise Drive Property was anything other than an arm's length transaction.

the Cabin for quite some time.[5]  The Debtor was also able to enter into a contract for the sale of the Cabin to a third party.[6]

On February 26, 1991, the Debtor sold the Cabin, and she received net proceeds from the sale of $82,823.32.

The Debtor testified that the closing concerning the Cochise Drive Property was scheduled for Friday, March 22, 1991.

A number of events then occurred.

First, on March 20, 1991, the Debtor utilized the sum of $60,539.32 in net proceeds received from the sale of the Cabin to reduce or "pay down" her mortgage on the Cochise Drive Property.

The next event which occurred—also on Wednesday, March 20, 1991—was that a moving van arrived at the Debtor's Cochise Drive Property and removed essentially all of the Debtor's furniture and personal belongings from the Cochise Drive Property.  The Debtor had the assistance of another individual on that Wednesday to pack the various belongings and clean the Cochise Drive Property.  At the end of the day, only a couch and a few personal belongings and cleaning items were left at the Cochise Drive Property.  However, the Debtor testified that, as of March 20, 1991, she continued to reside at the Cochise Drive Property.[7]

The Debtor intended to move to 2244 Encanto Drive, N.E., Phoenix, Arizona (the "Encanto Drive Property").  Because of weather conditions, the Debtor's personal belongings were not unloaded at the Encanto Drive Property until Thursday, March 21, 1991.  The Debtor supervised the unloading of her furniture and personal belongings at the Encanto Drive Property.

On March 21, 1991, the Maricopa County Recorder recorded her declaration of homestead on the Cochise Drive Property.[8]  The Debtor's telephone service to the Cochise Drive Property was also discontinued on March 21, 1991.

On March 21, 1991, at the end of the day, the Debtor testified that she returned to the Cochise Drive Property.  The Debtor testified that she did not stay at the Encanto Drive Property, because the owner of the Property was away on March 21.  The owner corroborated the Debtor's testimony, stating that he was indeed out-of-state on March 21, 1991.[9]

On March 22, 1991, the Debtor transferred her mailing address to the Encanto Drive Property.  She also saw her neighbor at the Cochise Drive Property.  The neighbor confirmed that (i) she saw the Debtor on March 22, 1991 in the morning;  (ii) that the Debtor did not call before she came over;  and (iii) that the Debtor did not have a car parked on the driveway or the street at the time.  The Debtor declined the neighbor's invitation for lunch and left.

The closing on the Cochise Drive Property also occurred on March 22, 1991 at approximately 4:00 to 4:30 p.m., and the Debtor received net cash proceeds of $100,761.84 from the sale.  The Debtor testified that she commenced residing at the Encanto Drive Property on March 22, 1991, after the closing on her Cochise Drive Property had occurred.

The Debtor's electrical service for the Cochise Drive Property was changed to the name of the purchasers on March 23, 1991.

---

5.  At the April 22, 1993 hearing, the Debtor's fiancé confirmed that the Cabin had been for sale for at least a year.

6.  The objecting parties did not present any evidence that the sale of the Cabin was anything other than an arm's length transaction.

7.  At the October 19, 1993 hearing, the Debtor's fiancé testified that he was in Fresno, California on March 20, 1991, and that he called the Debtor at the Cochise Drive Property that evening.  He determined this apparently from reviewing his calendar.

8.  The Debtor testified that she actually delivered the Declaration to the Maricopa County Recorder's Office on March 20, 1991.  She did not know why the declaration was not recorded until March 21, 1991.

9.  At the October 19, 1993 hearing, the Debtor's fiancé testified that, when he returned home on March 22, 1991, there was no evidence or sign that the Debtor had stayed overnight at the Encanto Drive Property.  The Debtor did testify that her furniture and belongings were unloaded at the Encanto Drive Property on Thursday, March 21, 1991.

On March 25, 1991, the Debtor placed the net proceeds from the sale of the Cochise Drive Property in an account at Citibank.

During the critical time periods when the Debtor closed the transaction on the Cochise Drive Property, received the net proceeds from said sale, and placed the proceeds in a Citibank account, the Debtor was represented by bankruptcy counsel.[10]

On August 1, 1991, Western Farm obtained a judgment in the State Court against the Debtor in the amount of approximately $40,000.

On September 19, 1991, the Debtor caused Citibank to issue Cashier's Check No. 487581849 in the face amount of $100,000 payable to the Debtor.

Western Farm then requested a temporary restraining order from the state court concerning the net proceeds received by the Debtor from the Cochise Drive Property. On January 15, 1992, the state court issued the temporary restraining order. The Debtor was prohibited from endorsing or negotiating the Citibank Cashier's Check or placing the proceeds therefrom in exempt property.[11] Normally, a temporary restraining order is only issued for ten days.[12] In this case, the temporary restraining order was apparently still in effect up to the point when the Debtor filed her Chapter 11 petition.

On March 17, 1992, the Debtor filed her voluntary petition under Chapter 11. At the time, she was represented by counsel. However, the Schedules and the Statement of Financial Affairs were not filed with the bankruptcy petition. No explanation has been given as to why the Schedules and Statement of Financial Affairs were not filed with the Petition or shortly thereafter.

Commencing in January, 1992, the Debtor entered into an agreement with her fiancé, who was also the owner of the Encanto Drive Property, to purchase a one-half interest in said Property. The initial agreement was executed by the parties on January 15, 1992, but neither party performed pursuant to the agreement because of the temporary restraining order issued by the State Court.[13]

Once the Debtor filed her bankruptcy petition on March 17, 1992, the Debtor and her fiancé promptly moved forward with their agreement. On March 30, 1992, the Debtor entered into a contract with her fiancé to purchase a one-half interest in the Encanto Drive Property for the purchase price of $100,000.[14] Her fiancé testified that this agreement also incorporated changes requested by the Debtor's bankruptcy counsel. These changes provided that upon the sale of the Encanto Drive Property, the Debtor would receive the first $100,000 in net proceeds, her fiancé would receive the second $100,000 in net proceeds, and any surplus proceeds would be divided between them on a fifty-fifty basis. At all relevant times, the owner of the Encanto Drive Property was

---

**10.** The Debtor is still represented by the same firm, albeit a different attorney at that firm.

**11.** The temporary restraining order provided, in pertinent part, that the Debtor was enjoined

from endorsing or otherwise negotiating the [Cashier's Check] or the proceeds thereof and from taking any steps which would allow the subject fund to be utilized for the acquisition of a residence which would qualify as a homestead or for any purpose which would otherwise purportedly cloak said fund with an exemption pursuant to A.R.S. Section 33–1101 *et seq.*
*See* Western Farms' Ex. M.

**12.** *See Ariz.R.Civ.P.* 65, which states:

Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record;

shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record.

**13.** *See* Western Farm's Ex. R. The Debtor's fiancé testified that he never recorded this agreement. Subsequent changes were made to this agreement as well.

**14.** *See* Debtor's Ex. 18. The agreement has a date at the top of March 30, 1992, but was executed on March 5, 1992. The parties also executed a special warranty deed. *See* Debtor's Ex. 19.

the Debtor's fiancé.[15] This was a postpetition transaction for which the Debtor sought no prior Court approval. The Debtor admitted that she was aware that when she filed her Chapter 11 Petition, there were "controls in place" as to what actions she might take.

On April 1, 1992, the Debtor recorded a warranty deed with the Recorder, Maricopa County, Arizona, reflecting her one-half interest in the Encanto Drive Property, and the Debtor also recorded her declaration of homestead in the Encanto Drive Property.[16]

On April 1, 1992, the Debtor requested that her Chapter 11 proceeding be converted to one under Chapter 7. The Debtor had only been in a Chapter 11 proceeding for a two-week period. The Debtor requested the conversion at the time she filed her special warranty deed and her homestead declaration and when no Schedules or Statement of Affairs were on file.

On May 20, 1992, the Debtor filed her Schedules and Statement of Affairs. The Statement of Financial Affairs reflected that the Debtor had received yearly income in 1991 in the amount of $3,400 as a graduate assistant at Arizona State University.[17] The Debtor had received no income from that source for the first part of 1992.[18] The Debtor had received support from her ex-husband in the amount of $48,880 in 1991;[19] and in the first part of 1992, the Debtor had received $8,400.[20]

The Debtor's Schedules, filed in May 1992, also reflected that the Debtor had few assets and a great many liabilities. On Schedule A, the Debtor listed real property with a value of $100,000.[21] This presumably represented the Debtor's interest in the Encanto Drive Property, which she had acquired postpetition. The Debtor listed personal property with a value of $1,250.[22] However, the Debtor listed liabilities in excess of $1,046,-767.78.[23]

The Debtor also listed her monthly income from support at $5,430 in May 1992.[24] The Debtor had monthly expenses of $6,236.60 in May 1992,[25] reflecting a negative cash flow of $806.60 per month. The Debtor also listed a "rent/home mortgage" payment of $1,100 per month, although the Debtor had recently moved to the Encanto Drive Property.[26] On October 19, 1993, the Debtor testified that she was making these rent payments to her fiancé. The monthly rent payment was approximately $1,100, as set forth on the Debtor's Schedules. There was no explanation by the Debtor as to how she arrived at that rental payment amount. Given the fact that the Debtor owns a one-half interest in the Property, it is unclear to the Court why the Debtor apportions such a substantial amount of money to a rent payment. On April 22, 1993, the Debtor testified that in March or April, 1992, the Encanto Drive Property had a value of $280,000 to $300,000, with liens encumbering the property in the amount of $180,000. The Debtor testified that she believed her fiancé used a portion of her cash payment (the sum of $20,000) to pay down his mortgage on the Encanto Drive Property. She also testified that her fiancé refinanced his mortgage at approximately that time, but she was not an obligor on the loan documentation. On October 19, 1993, her fiancé testified that the Encanto Drive Property had a value of $300,000 in April, 1992; that he had refinanced the mortgage on the property in January, 1992; that the encumbrances had been around $192,000; and that he had utilized the sum of $20,000, or a portion of the

---

**15.** The Debtor testified that she started dating the owner in 1989. In 1992, the owner was her fiancé. He still remains her fiancé today.

**16.** *See* Debtor's Ex. 19–20.

**17.** *See* Statement of Financial Affairs, Docket Entry No. 10, Question 1.

**18.** *See id.*

**19.** *See id.* at Question 2.

**20.** *See id.* at Questions 1–2.

**21.** *See* Docket Entry No. 10.

**22.** *See id.* at Ex. B.

**23.** *See id.* at Ex. F.

**24.** *See id.* at Schedule I.

**25.** *See id.* at Schedule J.

**26.** *See id.* at Schedule J.

money that he had received from the Debtor, to pay down the mortgage.

If we assume that the mortgage was approximately $172,000 in April, 1992; that her fiancé was paying interest thereon at the rate of ten percent (10%) per annum, or $17,200 annually; that the mortgage had a thirty-year amortization; then her fiancé would have made monthly interest only payments on the mortgage in the amount of roughly $1,433. Therefore, the rent payment of $1,100 per month paid by the Debtor seems high. The Debtor also listed other expenses for electricity, heating fuel, water and sewer, telephone and house maintenance. It is unclear how the Debtor arrived at these figures, since she was a co-owner of the Encanto Drive Property.

Certainly the Debtor had insufficient income to fund a plan of reorganization to repay her creditors in a Chapter 11 proceeding. Other than upon the advice of counsel, the Debtor could not explain why, with so little income to repay her creditors and so few assets, she filed a Chapter 11 petition.

During the course of the proceedings, Mr. Todd Franks, former divorce counsel to the Debtor, testified on certain issues of credibility of the Debtor and her fiancé.[27] Mr. Franks focused on a meeting which occurred on March 8, 1990, at which the Debtor and her fiancé were in attendance. The Debtor and her fiancé also testified on October 19, 1993 as to their recollections of what occurred at that meeting. Although Mr. Franks recalls obtaining copies of the Arizona statutes concerning the homestead exemption and discussing the matter with both parties, his contemporaneous notes of the March 8, 1990 meeting do not reflect such a discussion. However, Mr. Franks was discussing numerous issues with the Debtor on March 8, 1990. It is certainly possible that Mr. Franks discussed the Debtor's settlement with Dr. Elia, whether Dr. Elia might file a bankruptcy petition, and if Dr. Elia filed a bankruptcy petition first, whether he would control the claim of homestead. Mr. Franks also stated that he was an "issue spotter" and that the Debtor needed to retain her own bankruptcy counsel.

27. Mr. Franks testified on August 13, 1993.

Mr. Franks testified credibly as to his recollection of the March 8, 1990 meeting. However, it is also possible that the Debtor did not place the same importance on his advice as she would have if she were about to file her own bankruptcy petition. The Debtor was planning to react to the actions of Dr. Elia, not initiate bankruptcy in March 1990.

The Court also concludes that her fiancé became aware of the homestead statutes at the March 8, 1990 meeting as well. However, he was analyzing the advice of Mr. Franks in the context of Dr. Elia's filing of a bankruptcy petition within the near future. Therefore, this Court cannot conclude that, based upon the different recollections of what occurred at the March 8, 1990 meeting, that the Debtor's or her fiancé's credibility was seriously undermined to the point that this Court should reject the testimony of the Debtor or her fiancé.

The Court also concludes that Mr. Franks credibly testified that he did not anticipate the Debtor arriving with her fiancé at the March 8, 1990 meeting and that he advised both parties that there would be no attorney-client privilege about any communications in her fiancé's presence. Mr. Franks testified that the Debtor's fiancé then advised Mr. Franks that the fiancé said he was the Debtor's attorney.

The Debtor's fiancé testified on October 19, 1993, that he called Mr. Franks prior to the March 8, 1990 meeting and asked whether it would be all right to attend the conference between the Debtor and Mr. Franks. He testified that he and the Debtor were aware that there would be no attorney-client privilege at such a conference.

A review of Mr. Franks' contemporaneous notes reflects that Mr. Franks discussed a number of important matters with the Debtor on March 8, 1990. Her fiancé was apparently present during the entire conference. The Debtor's fiancé graduated from Harvard Law School in 1976 and is a partner at a major law firm in Phoenix. He specializes in general litigation matters. As such, he must be extremely familiar with the attorney-client

privilege. He knew that confidential information was probably going to be presented during the March 8 meeting, yet he attended the meeting and remained throughout. The Court can draw no other conclusion than Mr. Franks was more credible as to the discussion between him and the Debtor's fiancé prior to the start of the March 8 meeting. Having so concluded, however, this Court will not reject the testimony of the Debtor and her fiancé on all factual matters testified to by them.

### Legal Issue

### Whether the Debtor Has Claimed A Valid Postpetition Homestead Exemption.

In determining this broad legal issue, the Court must consider a number of subissues and a variety of pre- and postpetition transactions.

These subissues may be described as follows:

I. Whether the Debtor May Use Non-exempt Property to Pay Down a Mortgage on Certain Real Property.

II. Whether the Debtor Resided at the Cochise Drive Property at the Time the Homestead Declaration Was Filed.

III. Whether the Debtor Recorded Her Homestead Declaration Prior to the Voluntary Sale of the Real Property.

IV. Whether the Debtor Could Transfer Postpetition the Net Proceeds Received From the Sale of Real Property to Obtain a Partial Interest in Other Real Property and File a Homestead Declaration Thereon.

To resolve these issues, the law of Arizona must be considered and analyzed on the homestead exemption issue. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

**I.** *Whether the Debtor May Use Nonexempt Property to Pay Down a Mortgage on Certain Real Property.*

Arizona law concerning homestead exemptions has recently been amended. In this case, all actions pertaining to the claim of a homestead exemption on certain real property, and the proceeds thereof, occurred prior to the enactment of the current statutory law on homestead exemptions. However, this Court will discuss the recently enacted changes to the relevant statutory provisions, since such a discussion supports this Court's decision.

At the time of the various transactions, Arizona law generally provided as to the individuals entitled to such an exemption and the amount and nature of the property to be claimed exempt as follows:

A. Any person the age of eighteen or over, married or single, who resides within the state may hold as a homestead exempt from attachment, execution and forced sale, not exceeding one hundred thousand dollars in value, any one of the following:

1. The claimant's equity interest in real property in one compact body upon which exists a dwelling house in which the claimant resides.

*Ariz.Rev.Stat.Ann.* § 33–1101(A.) (West 1990).[28] Therefore, the Debtor, as a single person, was able to claim a homestead exemption in certain real property, so long as the Debtor's equity interest in the property did not exceed the value of $100,000. In September, 1990, the Dissolution Decree was entered in the State Court, which provided that the Debtor would obtain a divorce and receive certain property obtained during the marriage to Dr. Elia as her sole and separate property. The Debtor initially had to decide whether to file a homestead declaration on the Cabin or the Cochise Drive Property. The evidence reflected that although both the Cabin and the Cochise Drive Property had been on the market for quite some time, they were both sold to disinterested third parties, with the closings to occur in February or March 1991.

■ In March and April 1991, the Debtor was receiving sufficient advice in the bank-

---

**28.** Section 33–1101(A.)(1.) has recently been amended to substitute the word "person" for "claimant". *See* 1994 Ariz.Legis.Serv. 206

(West). The effective date of the statute is July 17, 1994.

ruptcy area to plan carefully how to maximize her exemptions. The Debtor realized that she could only claim an exemption on one parcel of real property. Since she was selling both the Cabin and the Cochise Drive Property, she could only claim an exemption on one. She also realized that she had the flexibility to take the net proceeds from the sale of one parcel and pay down the encumbrance on the other. This procedure would permit her to claim the maximum equity in a parcel of real property to be subject to the homestead exemption. At the time, the Debtor's principal residence was the Cochise Drive Property. Therefore, there was sophisticated bankruptcy planning concerning the Debtor's immediate use of the Cabin net proceeds to pay down her mortgage on the Cochise Drive Property and then claim the Cochise Drive Property as exempt. However, this planning occurred approximately *one year* prior to the Debtor's filing her bankruptcy petition, and at a time when it appeared imminent that Dr. Elia would file a bankruptcy petition. Mr. Franks testified that he did advise the Debtor on "controlling" the homestead exemption vis à vis Dr. Elia. Whether the Debtor received the advice from Mr. Franks (the most likely party) or from some other third-party source, she certainly planned the transaction with precision.

The Debtor is intelligent and well-educated.[29] The Debtor testified that she obtained the form for a declaration of homestead (upon advice of counsel) and completed the form on her own. The Debtor testified that she could not remember why she wanted the homestead declaration recorded on March 20, 1991. Although the homestead declaration was not recorded until March 21, 1991, at which point the Debtor had removed almost all of her belongings from the Cochise Drive

Property, the Court concludes that the Debtor was physically present at the Cochise Drive Property until March 22, 1991.

The objecting parties are, of course, concerned with the transactions involving the paydown of the mortgage on the Cochise Drive Property and the filing of the homestead declaration as to the Cochise Drive Property.

■ In considering the paydown of the mortgage, various commentators have not condemned the practice. One commentator stated:

> It is not unusual for a debtor contemplating bankruptcy to increase her exempt property before filing. She converts nonexempt property to exempt property *on the eve of bankruptcy* by swapping (directly or indirectly) one kind for the other or by conveying solely-owned property to a form of joint ownership with a spouse that will put the property beyond creditors' reach. The debtor's lawyer may have advised her to do so as prudent "bankruptcy planning." The debtor's unsecured creditors who are thereby affected call it something else: actual fraud.
>
> There is no single answer whether such a conversion is right or wrong, permitted or damned in bankruptcy.

David G. Epstein, *et al., Bankruptcy*, "Exempt Property", § 8–32 (1992). As Epstein points out, this area of inquiry must be determined on a case-by-case basis, since the resolution of the issue is "fact-intensive." *Id.* The debtor may convert nonexempt property to exempt property on the eve of filing a bankruptcy petition. This is not a *per se* fraudulent practice. *Id.* at 574–75.[30] The debtor may also be insolvent at the time and intend to place the property beyond the reach of creditors. Again, these additional

---

**29.** The Debtor testified that she was a graduate student at Arizona State University. Although the Debtor attempted to persuade the Court that she did not always understand what was going on, Mr. Franks testified that she was thorough and always wanted to be informed and understand what was going on in her legal matters with Dr. Elia. Based upon the Debtor's testimony before this Court and the actions taken by her as described in this opinion, this Court concludes that the Debtor did understand the various ex-

emption issues presented to her and was intelligent enough to maximize her homestead exemption.

**30.** Epstein cites to such Ninth Circuit decisions as *In re Daniel* and *In re Love* in his analysis. *In re Daniel*, 771 F.2d 1352 (9th Cir.1985), *cert. denied, Daniel v. Security Pac. Nat'l Bank*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *In re Love*, 341 F.2d 680 (9th Cir.1965).

factors do not necessarily lead to a finding of fraudulent intent by the debtor. *Id.*

In this case, the Debtor received the net proceeds from the sale of the Cabin substantially prior to filing her own bankruptcy petition. She wanted to protect her funds and claim exemptions thereon if possible. She paid down the mortgage on the Cochise Drive Property with the net proceeds from the sale of the Cabin to protect her right to an exemption vis à vis Dr. Elia and the filing of a bankruptcy petition by Dr. Elia. This Court does not disapprove of the paydown of the mortgage on the Cochise Drive Property given the facts in this case.

**II.** *Whether the Debtor Resided at the Cochise Drive Property at the Time the Homestead Declaration Was Filed.*

The next transaction concerns the filing of the homestead declaration on the Cochise Drive Property. The Debtor executed the deed transferring the Cochise Drive Property to third-party purchasers on March 21, 1991. The Debtor executed and delivered the homestead declaration to the County Recorder's Office on March 20, 1991. The homestead declaration was recorded on March 21, 1991. The Debtor actually delivered the Cochise Drive Property deed to the purchasers at the closing on March 22, 1991. The Court concludes that the Debtor remained at the Cochise Drive Property until March 22, 1991.

■ The critical issue is whether the Debtor still "resided" at the Cochise Drive Property at the time she filed her homestead declaration. *See Ariz.Rev.Stat.Ann.* § 33–1101(A.)(1.) (West 1990).[31] In reviewing Arizona case law on the issue, the Court notes that the term "reside" requires at least the physical presence of the individual claiming a homestead exemption. *Morrisey v. Ferguson,* 156 Ariz. 536, 753 P.2d 1192 (Ariz.App. 1988) (individual that filed a homestead dec-

laration while in the custody of the Arizona Department of Corrections did not reside in the mobile home for purposes of *Ariz.Rev. Stat.Ann.* § 33–1101(A.)(4.) and, hence, did not comply with the requirements of the statute).[32]

■ In the decision of *In re Garcia,* 168 B.R. 403 (D.Ariz.1994), one of the issues presented on appeal was whether the debtor could claim a residence as exempt property under Arizona law even though she was not present at the residence on a day-to-day basis.[33] The District Court stated:

> Arizona law requires that the homestead exemption be liberally construed in favor of the debtor. *In re Renner,* 822 F.2d 878, 880 (9th Cir.1987) (applying Arizona law). There are no reported cases discussing whether "resides" as it is used in Section 33–1101(A)(1) requires physical presence on a day-to-day basis. Courts construing homestead exemption statutes in other states, however, have determined that a "temporary absence" from a home will not defeat a homestead claim if a party intends that home to be his residence. [Citations omitted.] The court agrees with the bankruptcy court that this proposition is also applicable to Section 33–1101(A)(1).

*Id.* at 408. In this case, the Debtor was moving from her residence on Cochise Drive, but she intended, throughout the process, to reside on Cochise Drive until the closing occurred on the sale of said home. Although she had minimal belongings at the Cochise Drive Property on the closing date, her intent should be controlling on the issue.

It is also instructive to review a case from the Tenth Circuit on this issue of residence. In the decision of *In re Raymond (Region 12 Revolving Loan Fund Corp. v. Raymond),* 987 F.2d 675 (10th Cir.1993), the court noted that at the time the debtors filed their bankruptcy petition, the husband had already

---

**31.** See *supra,* note 27, as to the current amendments to *Ariz.Rev.Stat.Ann.* § 33–1101(A.)(1.) (West 1994).

**32.** Although the *Morrisey* court considered *Ariz. Rev.Stat.Ann.* § 33–1101(A.)(4.) in its analysis, the subsection has the same requirement as *Ariz. Rev.Stat.Ann.* § 33–1101(A.)(1.) (West 1990), that

the individual claiming the exemption reside on the property which is claimed as the homestead.

**33.** The Court was considering whether the terms and conditions of *Ariz.Rev.Stat.Ann.* § 33–1101(A.)(1.) were met. This statutory section is cited in full in this decision.

moved to Texas with the couple's children. The wife remained in Colorado and lived in the home. She arranged for the family's belongings to be packed, and ten days after the bankruptcy petition was filed, the family's belongings were shipped to Texas. *Id.* at 676. Subsequently, the bankruptcy trustee sold the residence and the wife asserted her exemption against the proceeds of the sale. *Id.*

In reviewing Colorado law, the *Raymond* court noted that the debtors must show that the homesteaded property could be claimed as exempt "while occupied as a home by the owner thereof or his [sic] family". *Id.* Under Colorado law, a debtor may preserve an exemption in the proceeds received from the sale of homesteaded property, even if the sale occurred prepetition and the proceeds were received postpetition, so long as the debtor utilized the proceeds for the acquisition of another home. *Id.* The Tenth Circuit noted that the debtor in *Raymond* did occupy the residence on the date of filing and for ten (10) days thereafter, that her "intention to move in the immediate future [did] not disqualify her homestead rights in the property," and that the husband's leasing a home with an option to purchase in Texas further reflected the wife's intent to place the proceeds in a new residence. *Id.* at 677.

In this case, the Debtor did reside in the Cochise Drive Property up to the point of closing. Once she received the net proceeds from the sale, she held the funds in a segregated account up to the point when she acquired her interest in the Encanto Drive Property. Therefore, pursuant to *Raymond,* this Debtor, although in the process of moving, still resided at the Encanto Drive Property at the time her declaration of homestead was recorded.

The objecting parties ask this Court to follow the decision of *In re Luthje,* 107 B.R. 292 (Bankr.D.Mont.1989). The *Luthje* court relied on the applicable state law in determining whether the debtor's homestead exemption was valid. The relevant statute provides, in pertinent part:

The homestead consists of the dwelling house or mobile home, and all appurtenances, in which the claimant resides and the land, if any, on which the same is situated, selected as provided in this chapter.

*Id.* at 295.[34] In determining the meaning of the term "reside", the *Luthje* court noted that the mobile home which was claimed as exempt did not have any utilities or garbage pickup service. The debtor was unsure whether the mobile home had been placed on the real property before the bankruptcy petition was filed. A creditor or interested party had testified that in viewing the property on ten separate occasions in a one-month period, the debtor was never present. The majority of the debtor's belongings were located at another property. The debtor also still had access to a property in which the debtor had resided for at least two years prior to the filing of the bankruptcy petition. *Id.* The Court then concluded:

Under Montana law, a homestead cannot be claimed unless the Debtor resides on the property. His claim of residence at the mobile home site is a sham for all of his family belongings are still at this father's home.

*Id.* at 296. Certainly this Court can appreciate that given the factual circumstances in *Luthje,* the evidence reflected that the debtor was never physically present at the mobile home for any length of time. Therefore, the *Luthje* court required a certain permanence or continuity in defining the term "resides".

The facts and law in this case are different. The Debtor resided at the Cochise Drive Property for a prolonged period of time. The Debtor's furniture and belongings were continuously present at the Property until March 20, 1991. Even after the furniture and her belongings were removed from the Cochise Drive Property, the Debtor continued to be physically present at the Property until after the homestead declaration was recorded. Moreover, the recent *Garcia* decision, *supra,* reflects that, under Arizona law, the intent of the individual is the critical factor in determining where an individual resides and that the individual need not be

---

**34.** *See Mont.Code Ann.,* § 70–32–101 (year not stated).

present at the residence on a day-to-day basis. The *Raymond* decision, *supra*, further reflects that an individual may claim certain property as a homestead even though the individual is in the process of moving. Therefore, based upon the facts of this case, and an analysis of *Garcia* and *Raymond*, this Court concludes that the Debtor still resided at the Cochise Drive Property when the homestead declaration was recorded. Therefore, this Court concludes that the Debtor has met this condition of the statute.

**III.** *Whether the Debtor Recorded Her Homestead Declaration Prior to the Voluntary Sale of the Real Property.*

For consideration of this issue, this Court must analyze *Ariz.Rev.Stat.Ann.* § 33–1101(C.) (West 1990), which provided at the time of the transactions:

> **C.** If a homestead claimed under subsection A has been duly recorded before the date of a voluntary or involuntary sale of the property, the homestead exemption, not exceeding the value provided for in subsection A, automatically attaches to the claimant's equity interest in identifiable cash proceeds from the sale. The homestead exemption in identifiable cash proceeds continues for eighteen months after the date of the sale of the property or until the claimant files a new claim of homestead exemption pursuant to subsection A, whichever period is shorter. Only one homestead exemption at a time may be held by a person under the provisions of this section.

■ There are a number of conditions which the individual must comply with under this subsection. First, the homestead declaration must be "recorded" before the "voluntary or involuntary sale" of the property which is claimed as exempt. If this condition is met, then the homestead exemption automatically attaches to the individual's equity interest in identifiable cash proceeds from the sale. Finally, the homestead exemption in identifiable cash proceeds only continues for an 18–month period after the sale or until the individual files a new homestead declaration, whichever period is shorter.

The key to this provision concerns when does a "voluntary sale" of the property occur? Is it upon the execution of the contract for the sale of the property? Is it at the time of closing when the deed is delivered to the purchaser? Is it some other relevant time period? This Court could not locate any Arizona decision which determined the issue after the enactment of *Ariz.Rev.Stat. Ann.* § 33–1101(C.) (West 1990). Moreover, the 1994 amendments to Section 33–1101(C.) no longer require that the claim of homestead be recorded with the County Recorder. In most cases, the claim of homestead is now automatic.

Arizona law previously indicated that an individual must file a homestead declaration prior to the contract of sale being executed. The decision of *Strahan v. Haynes*, 33 Ariz. 128, 262 P. 995, 999 (Ariz.1928) stated in *dicta:*

> If, on the other hand, the declaration of homestead was made after the execution of the agreement to convey, it would be of no effect so far as such agreement was concerned, for, as we have pointed out, in the eyes of equity the "sale" had actually been made before the declaration. Since there is nothing in the record to show whether or not the declaration of homestead was recorded before or after the execution of the agreement for sale, we cannot say the trial court erred in its rejection thereof.

*Id.* 262 P. at 999. However, in *Strahan*, the Court was only considering the issue of to what extent an individual could utilize the homestead exemption as a means to void a contract of sale which was voluntarily entered into by the individual prior to the filing of the homestead declaration and upon which a judgment of specific performance had been obtained. Moreover, in the decision of *Schreiber v. Hill*, 54 Ariz. 345, 95 P.2d 566 (1939), the court stated that the homestead declaration could be filed at any time prior to the *actual sale* of the property, indicating up to the point of closing.

In *McLaws v. Kruger*, 130 Ariz. 317, 636 P.2d 95 (1981), the court held that a creditor with a money judgment could garnish the net proceeds from a sale being held by the title company concerning property which an individual had previously claimed as exempt. However, the *McLaws* decision was rendered

prior to the enactment of *Ariz.Rev.Stat.Ann.* § 33–1101(C.) (West 1990) which permits an individual to obtain an exemption in the net identifiable cash proceeds received from the sale of property upon which a homestead declaration has been recorded.

■ In reviewing *Ariz.Rev.Stat.Ann.* Section 33–1101(C.) prior to its amendment in July 1994, this Court notes that the exemption automatically transferred to the identifiable cash proceeds of a sale. However, the cash proceeds would not be received by an individual unless the closing concerning the real property had occurred. The closing would require the actual delivery of the deed by the seller in exchange for the delivery of the consideration by the purchaser. Therefore, the exemption would only transfer to the identifiable cash proceeds at the time the consideration is actually delivered to the seller. Logically, it would follow that so long as the other requirements of the statute were met, if the homestead declaration were recorded prior to the closing of the sale transaction, the declaration would be timely recorded in accordance with Arizona law.

The current codification of Section 33–1101(C.) further supports this Court's determination.[35] Although this amended Section was not effective until July 17, 1994, well after the transactions described herein occurred, the Section now provides:

> The homestead exemption, not exceeding the value provided for in subsection A, of this section, automatically attaches to the person's equity interest in identifiable cash proceeds from the voluntary or involuntary sale of the property. The homestead exemption in identifiable cash proceeds continues for eighteen months after the date of the sale of the property or until the person establishes a new homestead with the proceeds, whichever period is shorter.

Only one homestead exemption at a time may be held by a person under the provisions of this section.

*Ariz.Rev.Stat.Ann.* § 33–1101(C.) (West 1994). This Section must also be read in conjunction with the recent amendments to Sections 33–1102 and 33–1105. As of July, 17, 1994, Section 33–1102 now reads, in relevant part:

> A. A person who is entitled to a homestead exemption as prescribed by § 33–1101 holds that exemption by operation of law and no written claim or recording is required. If a person has more than one property interest to which a homestead exemption may reasonably apply, a creditor may require the person to designate which property, if any, is protected by the homestead exemption.

\* \* \* \* \* \*

*Ariz.Rev.Stat.Ann.* § 33–1102(A.) (West 1994). If the creditor requires that the individual designate a property subject to a homestead exemption, the individual may designate the property by either responding only to the creditor *or* by recording a homestead exemption as to certain property with the county recorder where the subject property is located.[36]

The 1994 amendments to the homestead exemption statutes reinforce the individual's right to a homestead exemption, now in most cases automatically, to preserve the individual's "nest egg" in the property. This emphasis on the excess funds or equity in the homestead property, rather than the protection of the land itself, is consistent with a long line of Arizona cases. *See Security Trust & Sav. Bank v. McClure,* 29 Ariz. 325, 241 P. 515 (Ariz.1925); *Union Oil Co. of Arizona v. Norton–Morgan Commercial Co.,* 23 Ariz. 236, 202 P. 1077 (Ariz.1922);

**35.** *Ariz.Rev.Stat.Ann.* § 33–1101(C.) was amended by 1994 Ariz.Legis.Serv. 206 (West), which had an effective date of July 17, 1994.

**36.** The relevant provisions of Section 33–1102(A.) on this point are as follows:

The creditor shall demand the designation by sending a letter by certified mail, return receipt requested, to each address of the person which may reasonably be protected by the homestead exemption. The person shall designate the property by recording a homestead exemption in the office of the county recorder where the property is located or by sending the creditor a certified letter, return receipt requested, within thirty days of receiving the creditor's demand letter. If the person receives the creditor's letter and fails to respond as provided by this subsection, the person may only assert the homestead exemption by recording a claim in the office of the county recorder where the property is located.

*Ariz.Rev.Stat.Ann.* § 33–1102(A.) (West 1994).

*Schreiber v. Hill,* 54 Ariz. 345, 95 P.2d 566 (Ariz.1939).

There is also the public policy concern that the homestead exemption statutes should be liberally construed. *In re Garcia,* 168 B.R. 403, 408 (D.Ariz.1994); *Matcha v. Winn,* 131 Ariz. 115, 638 P.2d 1361, 1363 (Ariz.App. 1981). Since the Debtor in this matter continuously resided at the Cochise Drive Property, permitting the Debtor to file a homestead declaration up to the point of closing on a voluntary sale transaction is consistent with this policy.

█ Arizona law does not always permit an individual to hold a homestead exemption free of claims of third parties when the individual has acted inequitably toward the third parties. *In re Glaze,* 169 B.R. 956 (Bankr. D.Ariz.1994). However, a distinction should be drawn between an individual which utilized the homestead exemption as a means to vitiate a valid and voluntary sale of the homesteaded property to third parties and the third parties are damaged as a result of the individual's actions, and an individual that is performing pursuant to a contract for the voluntary sale of the property and wishes to protect the net proceeds received from the sale. This Court concludes that this Debtor falls into the latter category and wished to protect her interest in the net proceeds from the sale of the Cochise Drive Property. Her claim of exemption on these proceeds is valid.

**IV.** *Whether the Debtor Could Transfer Postpetition the Net Proceeds Received From the Sale of Real Property to Obtain a Partial Interest in Other Real Property and File a Homestead Declaration Thereon.*

The postpetition transactions which are prohibited or require bankruptcy court approval involve property of the estate.[37] Moreover, the postpetition transfer of encumbered property to the bankruptcy estate may result in the immediate vacatur of the automatic stay. *In re Oklahoma P.A.C. First Ltd. Partnership (Canadian Imperial Bank v. Oklahoma P.A.C.),* 122 B.R. 394 (Bankr.D.Ariz.1990).

█ Generally, all property in which the debtor has a legal or equitable interest becomes property of the bankruptcy estate upon the filing of the bankruptcy petition. For instance, 11 U.S.C. § 541(a)(1) provides:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

However, if a debtor claims certain property as exempt, the claim of exemption is not challenged by the trustee or a creditor within a fixed period of time, and the court-determined value of the property is equal to or less than the exemption, the property which is claimed as exempt is carved out of the estate and is no longer property of the bankruptcy estate. *See* 11 U.S.C. § 522(b);[38] *Owen v. Owen,* 500 U.S. 305, 307–08, 111 S.Ct. 1833, 1835, 114 L.Ed.2d 350 (1991). The debtor may amend his or her claim of exemptions up to the point that the case is

---

**37.** For instance, see 11 U.S.C. § 363 regarding the use, sale or lease of property of the estate, other than in the ordinary course of business, which requires court approval and 11 U.S.C. § 549 regarding certain postpetition transactions involving property of the estate which may be set aside.

**38.** 11 U.S.C. § 522(b) provides, in pertinent part:

Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either para-

graph (1) or, in the alternative, paragraph (2) of this subsection.

\*   \*   \*   \*   \*   \*

[A]ny property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place.

closed. *See* RBP 1009(a).[39] However, although property may be claimed as exempt postpetition, if the proceeds from the sale exceed the amount of the exemption, the bankruptcy court does have subject matter jurisdiction to direct how the proceeds from the sale of real property shall be distributed. *See In re Alsberg*, 68 F.3d 312, 315 (9th Cir.1995) (notwithstanding the debtor's postpetition homestead exemption claim, the proceeds of the postpetition sale of the debtor's residence vested in the estate, and were not automatically carved out as of the petition date; therefore, the estate was entitled to all postpetition appreciation in the property).

What troubles the Court in this case is that the filing of the bankruptcy petition and the actions taken immediately thereafter served no legitimate purpose under the Bankruptcy Code. Western Farm had obtained a judgment against the Debtor on August 1, 1991 and a temporary restraining order concerning the net proceeds from the sale of the Cochise Drive Property on January 15, 1992. The state court could have resolved the issue of whether the net proceeds from the Property were exempt under Arizona law. Rather than address the issue, the Debtor filed a Chapter 11 "bare bones" petition knowing that she had no income and no assets to fund a plan of reorganization, the Debtor promptly placed all of the net proceeds from the sale of the Cochise Drive Property beyond the reach of her creditors, the Debtor then converted her case and filed her Schedules and Statement of Affairs. The Debtor simply had no basis being in a Chapter 11 proceeding for even the two-week period that she was.

Although not directly on point, the Ninth Circuit has recently rendered a decision which cautions debtors that there may be severe consequences in filing bankruptcy petitions which have no legitimate purpose. In the decision of *In re Marsch*, 36 F.3d 825

(9th Cir.1994), the debtor was engaged in state court litigation with her ex-husband, just prior to the state court entering a restitution judgment against the debtor and in favor of the ex-husband, the debtor filed a Chapter 11 petition. *Marsch*, 36 F.3d at 827. The debtor did not have any business operations. *Id.* The debtor also had sufficient assets, if liquidated, to pay her ex-husband and her creditors. The bankruptcy court concluded that the debtor filed her petition to prevent entry of the state court judgment and to avoid posting an appeal bond. *Id.* at 829. The Ninth Circuit in *Marsch*, stated:

> The term "good faith" is somewhat misleading. Though it suggests that the debtor's subjective intent is determinative, this is not the case. Instead, the "good faith" filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings. [Citations omitted.] Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws. [Citations omitted.]

*Id.* at 828. The Ninth Circuit then stated that cases have been dismissed for "cause" under 11 U.S.C. § 1112(b), if the debtors have engaged in a variety of tactics unrelated to reorganization. *Id.* The Ninth Circuit did *not* decide whether a Chapter 11 petition could be filed for the purpose of avoiding the posting of an appeal bond, if satisfaction of the judgment would "severely disrupt" the debtor's business operations. *Id.* at 829. However, the facts in *Marsch* did reflect that the debtor had filed her bankruptcy petition in bad faith and the case should be dismissed for cause. The Ninth Circuit, in a two to one decision of the panel, also determined that sanctions should be imposed against the debtor pursuant to RBP 9011.[40] *Id.* at 830–31.

---

**39.** Bankruptcy Rule 1009(a) states in pertinent part:

*General Right to Amend.* A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed. The debtor shall give notice of the amendment to the trustee and to any entity affected thereby. On motion of a party in interest, after notice and a hearing, the court may order any voluntary petition, list, schedule, or statement to be amended and the clerk shall give notice of the amendment to entities designated by the court.

**40.** RBP 9011 provides:

(a) **Signature.** Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party

■ Based upon *Marsch*, this Court concludes that the Debtor filed a *Chapter 11* petition with no hope of presenting a feasible plan of reorganization. She had no basis in filing the *Chapter 11* petition other than to avoid the effect of the temporary restraining order issued by the state court and place the exempt net proceeds of certain homestead property beyond the reach of her creditors. Therefore, although her claim of exemption on the net proceeds was proper, her filing of a Chapter 11 petition and her subsequent failure to file in a prompt manner her Schedules and Statement of Affairs, her immediate placement of the exempt net proceeds with her fiancé, and her conversion to a Chapter 7 proceeding in only a two-week period were done in bad faith.[41]

The Court does pause, however, concerning the remedy requested. The Trustee and Western Farm have requested that the Debtor's claim of homestead on the Encanto Drive Property, which is the Property owned by the Debtor's fiancé and the Debtor and which is the Property in which the Debtor postpetition placed her exempt net proceeds, be set aside in its entirety. In essence, the Trustee and Western Farm are requesting that the Debtor turn over the sum of $100,000 to the bankruptcy estate. In this Court's opinion, Western Farm and the Trustee have

been pursuing a remedy that is too harsh. The Debtor did file her Chapter 11 petition in bad faith, but the remedy is not to set aside her claim of exemption on the Encanto Drive Property. The remedy is to grant appropriate relief or to grant sanctions for the harm caused by the Debtor. RBP 9011 sanctions may be one such remedy. The Ninth Circuit decision of *In re Townsend*, 929 F.2d 1358 (9th Cir.1990), does cast some doubt on this remedy, although the majority of the panel in *Marsch* upheld the award of sanctions for the bad faith filing of a bankruptcy petition. *Marsch*, 36 F.3d at 830–31.

■ In any event, the Court cannot, solely based upon the Debtor's bad faith filing of a Chapter 11 bankruptcy petition and the actions which occurred immediately thereafter, set aside the Debtor's claim of exemption in the amount of $100,000 on the Encanto Drive Property. The Court will entertain from the interested parties a more appropriate remedy for the Debtor's filing of her Chapter 11 petition in bad faith.

Finally, the Court notes that there still may be remaining issues as to the Encanto Drive Property. Real property values in the Phoenix area have increased, in some cases substantially, since March 1992, when the one-half interest in the Encanto Drive Property was acquired by the Debtor. A recent

represented by an attorney, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case. If a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose signature is required. If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on

the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

(b) **Verification.** Except as otherwise specifically provided by these rules, papers filed in a case under the Code need not be verified. Whenever verification is required by these rules, an unsworn declaration as provided in 28 USC § 1746 satisfies the requirement of verification.

(c) **Copies of Signed or Verified Papers.** When these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original.

**41.** The Court draws these conclusions based upon the evidence presented at the hearings on the Objections to Exemption. Admittedly, the focus of the hearings was not to pursue a sanction against the Debtor for filing her Chapter 11 proceeding in bad faith.

Ninth Circuit decision has held that a postpetition appreciation in the value of real property enures to the benefit of the bankruptcy estate, so long as it exceeds the debtor's exemption in the property. *In re Alsberg,* 68 F.3d 312, 315 (9th Cir.1995). *See also In re Hyman,* 967 F.2d 1316, 1321 (9th Cir.1992). Therefore, to the extent there has been appreciation, if any, in the Encanto Drive Property, the Trustee may wish to pursue the matter before the Bankruptcy Court.

The Objections of the Trustee and Western Farm to the Debtor's claim of exemption in the Encanto Drive Property are overruled. The Trustee and Western Farm may seek a more appropriate remedy for the Debtor's having filed her bankruptcy petition in bad faith.